### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**NOREEN J. KRAHNER,**

            **Plaintiff,**

**-vs-**                                **Case No.  6:05-cv-733-Orl-31JGG**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

            **Defendant.**

---

# REPORT AND RECOMMENDATION

      Plaintiff Noreen J. Krahner ["Krahner"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability, disability insurance benefits, and supplemental security income benefits. *See* Docket No. 1 (complaint). For the reasons set forth below, the Commissioner's decision should be **REMANDED**.

## I.    PROCEDURAL HISTORY

      On October 30, 2000, Krahner filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability due to seizure disorder as of October 10, 1986.[1]  R. 63-

---

[1]In her brief, Krahner states that she filed for benefits claiming disability as of July 16, 2000. Docket No. 13-1 at 2. At the hearing, the Administrative Law Judge (ALJ) asked whether the alleged onset date is October 10, **1996**, and Krahner's attorney said that the date was correct. R. 358. In her applications for benefits, Krahner alleges she became disabled on October 10, **1986**, when Krahner was fifteen years old. R. 63-65, 347-48. In her decision, the ALJ states that Krahner alleges disability as of October 10, 1986. R. 19. The Commissioner also uses the date October 10, 1986. Docket No. 14-1.

      According to Social Security Ruling 83-20, the onset date is "the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20. The onset date must be established and supported by the evidence because the amount of benefits may be affected. *Id*. Disability insurance benefits (DIB) may be paid up to twelve months before the month an application is filed. *Id*. Supplemental security income (SSI) payments are prorated for the first month for which eligibility is established after application. *Id*.

65, 347-48.  Her claim was denied initially, and upon reconsideration.  R. 48-51, 337, 343.  On

November 25, 2002, the Honorable Philemina M. Jones, Administrative Law Judge ["ALJ"], held a

forty-five-minute hearing on Krahner's claim in Orlando, Florida.  R. 349, 375.  Attorney Marc

Gomez represented Krahner at the hearing.  R. 349.  The ALJ heard testimony from Krahner and from

Jennifer Matthews, an impartial vocational expert ["VE"].

On January 30, 2003, the ALJ issued a decision that Krahner was not disabled and not entitled

to benefits.  R. 27.  Following a review of the medical and other record evidence, the ALJ found that

Krahner could not perform her past relevant work as a bartender, waitress, and pharmacy technician.

R. 19, 26, Finding 8.  The ALJ found that Krahner nevertheless retained the residual functional

capacity ["RFC"] to perform a significant range of the physical exertional requirements of light work,

subject to certain limitations.  R. 26, Findings 7, 12.  After hearing testimony from the VE, the ALJ

applied the Medical-Vocational Guidelines and concluded that Krahner was not disabled.[2]  R. 26,

Findings 13, 14.

The Appeals Council denied review.  R. 4.  On May 13, 2005, Krahner timely appealed the

Appeals Council's decision to the United States District Court.  Docket No. 1 at 1-2.  On October 12,

2005, Krahner filed in this Court a memorandum of law in support of her appeal.  Docket No. 13-1.

On December 5, 2005, the Commissioner filed a memorandum in support of her decision that Krahner

was not disabled.  Docket No. 14-1.  The appeal is ripe for determination.

---

[2]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50
to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center
workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must
rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court.
According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the
nation.  Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every
year  —  an average of about one per week.

## II.    **THE PARTIES' POSITIONS**

Krahner assigns five errors to the Commissioner.  First, Krahner alleges that the Commissioner erred by failing to articulate specific and adequate reasons for discrediting Krahner's testimony. Docket No. 13-1 at 7.  Second, Krahner claims that the Commissioner erred by failing to consider all of the relevant evidence on Krahner's epilepsy as required by the Code of Federal Regulations.  *Id.* at 8-9.  Third, Krahner claims that the Commissioner erred in finding that Krahner's testimony is not consistent with the medical evidence.  *Id.* at 11-12.  Fourth, Krahner contends that the ALJ failed to consider her seizures in applying the Medical-Vocational Guidelines and in her hypothetical question to the VE, such that the Commissioner failed to meet her burden of proving that other work exists in the national economy that Krahner can perform.  Finally, Krahner complains that she submitted additional records to the Appeals Council (after the ALJ's decision), and that the Appeals Council neither considered the new evidence, nor made it part of the record.  *Id.* at 14-15.  Krahner claims that the Commissioner erred by failing to consider the new evidence and failing to make it part of the record.  *Id.*

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the ALJ articulated specific and adequate reasons for discrediting Krahner's testimony.  Docket No. 14-1 at 8.  Second, the Commissioner counters that the ALJ considered all relevant evidence, and that Krahner's evidence of epilepsy is not supported by the record as a whole.  *Id.*  Third, the Commissioner argues that substantial evidence supports the ALJ's clearly articulated credibility finding.  *Id.* at 12.  Fourth, the Commissioner argues that the ALJ properly used the grids and relied on accurate VE testimony, and the Commissioner has met her burden of proving that other work exists in the national economy that Krahner can perform.  *Id.* at 13.

Finally, according to the Commissioner, the only "final decision" of the Commissioner that is subject to review by the district court is the ALJ 's decision, and not the Appeals Council's decision to deny review. The Commissioner argues that district court must evaluate the additional evidence under the standards for submitting new evidence. *Id.* at 17. The Commissioner contends that the additional evidence does not meet the standards for new evidence because it could not reasonably have been expected to change the administrative result. *Id.* at 14-16.

### III. **THE STANDARD OF REVIEW**

#### A. **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of

factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.      REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.   *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.   *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).   A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.      REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).   To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial

evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3]  *Id.*

### D.   STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE

After the ALJ's decision — but before the Appeals Council decision — Krahner states that she submitted additional medical records covering from November 23, 2001 through April 4, 2004.  Docket No. 13-1 at 14-15; *see also* Docket Nos. 13-2, 13-3.  If a claimant submits evidence that does not relate to the relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*

will advise [the claimant] of [his or her] right to file a new application."   20 C.F.R. § 404.976(b)(1)(2005).  If the Appeals Council makes the new evidence part of the record, the district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

In this case, Krahner submits to the district court copies of medical evidence which she claims to have submitted to the Appeals Council some eight months before the Appeals Council's decision on April 15, 2005.  R. 4.  *See* Docket No. 13-1 at 14 - 15; Docket No. 13-2 at 8 - 16 and 13-3 (records); and Docket No. 13-2 at 2 (postal return receipt showing receipt for certified mail by Appeal Council on August 9, 2004).  The Appeals Council did not return the additional evidence to the claimant, and did not make the new evidence part of the certified record.  *See* R. 1 - 5.  In her brief, the Commissioner does not deny that the Appeals Council received, but failed to consider, the evidence submitted.  Docket No. 14-1 at 16 - 20.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g)).   The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986)

(en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

 Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues.  *Sims*, 120 S.Ct. at 2086.  When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review.  20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086;  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review.  *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council.  *Keeton*, 21 F.3d at 1066.

 The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision.  *Sims*, 120 S.Ct. at 2086;  *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence.  *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).  Nevertheless, there is an important difference between *Falge* and this case — a difference stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the

claimant did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the *ALJ's decision* to deny benefits.  150 F.3d at 1324.  In this case, however, the claimant does expressly appeal and seek a reversal of the Appeals Council's decision to deny review.  Docket No. 1 at 3, ¶ F.  The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review.  *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct. at 2086; *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record).  The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

-10-

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies.  The Appeals Council has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence.  The Appeals Council, however, never sated whether it considered the additional evidence.  The Appeals Council's determination, including its failure to consider the additional evidence, is subject to judicial review.  The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review."  *See Sims*, 120 S.Ct. at 2086;  *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)); *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

-11-

### A.    DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not

prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).

Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education,

and past work) prevent him or her from doing other work that exists in the national economy, then

claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe,

the ALJ must consider the combined effect of all of the claimant's impairments, and must consider

any medically severe combination of impairments throughout the disability determination process.

42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not

in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528,

534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ

has considered all alleged impairments, both individually and in combination, and must make specific

and well-articulated findings as to the effect of a combination of impairments when determining

whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987);

*Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe

condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th

Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social

Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to

establish an impairment that meets the Listings, the claimant must prove an inability to perform the

claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the

ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether

a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f);

-13-

*see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).   The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201

-14-

(11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.     TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the

medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

**E.    PAIN**

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. §

-17-

423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including

pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with

the objective medical evidence.   20 C.F.R. § 404.1529.  In determining whether the medical signs

and laboratory findings show medical impairments which reasonably could be expected to produce

the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either
> (2) objective medical evidence that confirms the severity of the alleged pain arising
> from that condition or (3) that the objectively determined medical condition is of such
> a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone

can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself,

conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th

Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See*

*Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054

(11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective

pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon

v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## G.   MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

## H.   THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work. The listings for mental disorders are arranged in nine diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The criteria in

-19-

paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate

mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt.

404, Subpt. P, App. 1.   Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional

-22-

restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.   APPLICATION AND ANALYSIS

### A.   THE FACTS IN THE CERTIFIED RECORD

Krahner was born on February 20, 1971, and was thirty years-old on the date the ALJ issued the decision that Krahner was not disabled.  R. 27, 63.  Krahner completed eleventh grade, and subsequently obtained her GED.  R. 134, 357.  Krahner has past work experience as bartender, waitress, and pharmacy technician, and some work experience as a mail meterer.  R. 19, 114.  None of her past work, however, was substantial gainful activity, so Krahner has not engaged in substantial gainful activity since October 10, 1986, her alleged onset date.[4]  *Id.*  Krahner was insured for disability benefits through March 30, 2002.  R. 61.  Krahner filed applications for both disability insurance benefits and supplemental security income.  R. 63, 347.

Krahner claims disability as of October 10, 1986 due to seizure disorder.  Her medical records indicate a history of seizures beginning at age fifteen.  R. 334.  Krahner reports that, as a child, she

---

[4]In her brief, Krahner erroneously states that her October 20, 2000 SSI and DIB applications allege disability as of July 26, 2000.  Docket No. 13-1 at 2.  In fact, the applications allege disability as of October 10, 1986, and Krahner's brief recites her disability history from childhood.  Id. at 2 - 6; R. 63, 347.  The ALJ also used the October 10, 1986 onset date.  R. 19.

suffered a number of head injuries from being struck in the back of her head with a baseball bat and

a rock and falling from the roof of a two-story building.  R. 334.   After her first few seizures, doctors

from the Children's Children's Neurological Services in Richmond, Virginia  evaluated Krahner.  R.

162-64.   The team, including Dr. Ronald B. David, M.D. (specializing in child and adolescent

neurology) and Dr. Gregory Richter (a clinical child psychologist), diagnosed "seizure disorder;

convulsive, chronic" and oppositional disorder with depressive features.  R. 164.  The team noted that

Krahner's CT scan and EEG were normal.  They prescribed Depakote.  R. 162, 164.

      Dr. David saw Krahner on February 19, 1987, shortly before Krahner moved to Florida.  R.

160.  The doctor noted that  Krahner was "getting along well," but stated that he wished to continue

monitoring her progress after her move.  R. 160.  Krahner saw Dr. David again in September 1987.

R. 170.  In a letter dated September 16, 1987, Dr. David notes that Krahner had not been taking her

medication regularly and counsels Krahner about the risk of non-compliance with medication.  *Id.*

The doctor further stated that because of the risk of seizure, he could not permit Krahner to obtain a

driver's license.  *Id.*  Dr. David also noted that because the seizure medication made Krahner drowsy,

he prescribed a smaller dose of medication than her current dosage, with recommendations that the

dosage be increased over time.  *Id.*

      In October 1987, Krahner reported another seizure, and Dr. David increased her prescription

for seizure medication from two to three tablets every twelve hours.  R. 169.  On December 14, 1987,

Dr. David noted that he saw Krahner, and that her seizure medication level was not detectable.  R.

168.  Dr. David stated that this "impl[ies] that she missed medication which she acknowledged (sic)."

*Id.*

In October 1988, Krahner visited Dr. David again.  R. 167.  In a letter dated October 8, 1988, Dr. David states that Krahner had a low level of Depakote, and noted that "[a]gain, it appears that Noreen is not taking her medication."  *Id.*  Noting the results of her December 1987 visit, Dr. David observed that Krahner had "a long history of noncompliance with prescribed medications." *Id.*

On August 14, 1989, Dr. David's notes indicate that Krahner had been "seizure free" since her last visit.  R. 166.  He also warned Krahner not to become pregnant while on her seizure medication.  *Id.*  On October 2, 1989, Dr. David expressed distress at learning that Krahner had had a seizure, and  increased her dosage of Depakote medication.  R. 159.  On November 24, 1989, Dr., David noted that Krahner had not had a seizure since her prior visit.  R. 165.  He kept Krahner on Depakote.  *Id.*  There follows an seven-year gap without medical records.

Krahner's electroencephalography (EEG), dated August 7, 1997, revealed normal results, with no evidence of epileptiform potentials or other lateralizing features.  R. 284.  A brain CT scan was also normal.  R. 285.

On February 2, 1998, Krahner had a seizure and was taken, by ambulance, to the emergency room at St. Mary's Hospital in Maryland.  Ambulance workers reported that Krahner "was out" for approximately two to three minutes, and that she "came around slowly."  R. 280.  Krahner stated that she could not remember the seizure.  *Id.*  The doctor diagnosed "breakthrough seizures[,]" treated her with 500 milligrams of Depakote, and discharged her.  R. 280-81.

Krahner sought treatment with Dr. Emad R. Al-Banna, M.D. on August 3, 1999.  R. 184. Krahner complained of chronic epilepsy, and told Dr. Al-Banna that she had a seizure the previous Thursday.  Dr. Al-Banna prescribed Depakote.  *Id.*  On January 5, 2000, Krahner returned to Dr. Al-Banna and reported having a seizure on Wednesday.  R. 182.  Dr. Al-Banna noted that Krahner was

-25-

taking Depakote, which he states was "not effective" as Krahner "had a seizure last night[.]" *Id.*  The

doctor prescribed Depakote and Dilantin (another seizure medication).  *Id.*

On January 15, 2000, Krahner saw Dr. Al-Banna again, and complained of adverse reactions

to her seizure medication.  R. 183.  Krahner reported having dizziness and twitching facial muscles,

and also stated that she was "too tired."  *Id.*  Dr. Al-Banna's findings were that Krahner was epileptic,

and that she reacted to Dilantin and phenobarbital, a barbituate used to treat epilepsy.  *Id.*  Dr. Al-

Banna's notes indicate that Krahner's reaction was "possibly" to the phenobarbital. *Id.*  He prescribed

Dilantin.  *Id.*  On April 6, 2000, Krahner visited Dr. Al-Banna with complaints of chronic epilepsy.

R. 185.  Dr. Al-Banna's impression was epilepsy.  R. 186.  He kept Krahner on Dilantin.  *Id.*

Dr. Daniel A. Nieves-Quinones, M.D. conducted a neurological consultation on September

7, 2000.  R. 202-04.  Krahner reported having one seizure approximately every two months, except

for the previous eight or nine months during which she had seizures less frequently.  R. 202.  Krahner

stated that her most recent seizure occurred three weeks prior to the visit.  *Id.*  She told the doctor that

she was bartending when she lost consciousness after two jerks about ten or fifteen minutes apart.

*Id.*  The doctor's notes indicated that Krahner "was seen shaking all over."  *Id.*  She described her

seizures, in general, as "sudden collapse and generalized clonic activity for two to three minutes."

*Id.*  Dr. Nieves-Quinones' impression was a history of epilepsy, "idiopathic versus myoclonic versus

secondarily generalized."  R. 203.  He also noted that Krahner had signs of toxicity from Dilantin.

*Id.*

An electroencephalogram (EEG) dated on September 11, 2000 showed normal results R. 201.

A Magnetic Resonance Imaging (MRI) of  Krahner's brain dated November 2, 2000 revealed mostly

normal results, except for right maxillary and scattered ethmoid sinus mucosal disease.  R. 200.

Krahner went to the Florida Hospital emergency room on September 23, 2000 with complaints of abdominal pain.  R. 187.  Krahner also told the doctor that she had headaches and experienced dizziness. R. 190.  Krahner received treatment for acute abdominal pain, and was discharged R. 191.

On October 30, 2000, Krahner filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability due to seizure disorder as of October 10, 1986.  R. 63-65, 347-48.   Krahner returned to Dr. Nieves-Quinones on November 22, 2000 for a follow-up appointment.  R. 199.  She reported that since her prior visit in September 2000, she had approximately three or four seizures per month. *Id.*  Krahner complained of occasionally feeling light-headed. *Id.*  She also reported experiencing palpitations after taking Lamictal, an anticonvulsant medication used to control seizures, after taking the medication for three weeks. *Id.*  The doctor's impression was epilepsy, primarily or secondarily generalized. *Id.*  He recommended a trial of Topamax, another type of anticonvulsant medication. *Id.*

Dr. N. Currie Prichard administered a number of neuropsychological tests on December 12, 2000 and January 3, 2001.  Dr. Prichard completed a clinical neuropsychological evaluation on January 3, 2001.  R. 171-81.  Dr. Prichard concluded that "[d]espite the presence of some strengths, Krahner's neuropsychological deficits and her uncontrolled seizure disorder render her totally disabled from holding a job in any area." R. 171.  Dr. Prichard also stated that Krahner's test scores showed deficits that were consistent with seizure disorder and a history of multiple head injuries. *Id.*  He further stated that "[f]or all intents and purposes her disability is, at this time in the development of our medical resources, permanent in nature." *Id.*  Dr. Prichard stated that Krahner's right hand speed was "poor" and her stamina was "quite severely impaired" with both hands.  R. 175.  He opined that

"[t]his problem rules out a large number of vocations, particularly any job required rapid or sustained computer usage." *Id.*

A state agency physician completed a Physical Residual Functional Capacity Assessment on February 8, 2001. R. 206. The physician opined that Krahner was able to lift and carry fifty pounds occasionally and twenty-five pounds frequently; sit, stand, or walk work about six hours in an eight-hour workday; and push or pull without limitation. R. 207. Krahner also had frequent limitations climbing ramps and stairs, but no limitation climbing ladders, ropes, and scaffolds. R. 208. The physician also opined that Krahner had frequent limitations in balancing, stooping, kneeling, crouching, and crawling. *Id.* Krahner had no manipulative, visual, or communicative limitations, but had to avoid moderate exposure to hazards, such as machinery and heights. R. 209-10.

On February 8, 2001, Krahner saw Dr. Dale E. Wolford upon referral from Dr. Samano. R. 205. Dr. Wolford counseled her on the risks of taking seizure medications while pregnant. *Id.*

A state agency psychologist assessed Krahner's mental residual functional capacity on February 9, 2001. R. 213. The psychologist opined that Krahner was "moderately limited" in her ability to understand and remember detailed instructions; in her ability to carry out detailed instructions; in her ability to maintain attention and concentration for extended periods of time; and in her ability "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." R. 214-15. The psychologist assessed an organic mental disorder as shown by Krahner's impaired memory and impulse control and emotional lability. R. 219. The psychologist also opined that Krahner showed "mild" limitations in terms of restriction of her activities of daily living, difficulty maintaining social functioning, and difficulty maintaining

-28-

concentration, persistence, or pace.  R. 228.  The psychologist noted that Krahner had one or two repeated episodes of decompensation – each episode of extended duration – and further stated that an RFC Assessment was necessary. R. 218, 228.

On April 13, 2001, Krahner went to Dr. John G. Durham with complaints of a sprained left ankle.  R. 248.  Krahner told Dr. Durham that she had a grand mal seizure the previous Monday, and twisted her left foot and ankle.  *Id.*  Dr. Durham's impression was an ankle sprain and fractured tibia. He treated her with a removable walking cast and scheduled a follow-up appointment.  R. 249. Krahner returned on April 23, 2001, and was ambulating satisfactorily in her removable cast.  R. 248.

Upon referral from Dr. Prichard, Krahner saw Dr. Sampathkumar Shanmugham on May 17, 2001 for a consultative neurological examination.  R. 250-51.  Krahner reported to Dr. Shanmugham that her last seizure was the Sunday before her examination.  R. 250.  She related that she was with her mother when she had a generalized tonic-clonic convulsion during which she drooled and turned blue.  *Id.*  Krahner stated that she did not remember the seizure.  *Id.*  Krahner also reported that she has taken a number of different seizure medications but that she continued to have seizures despite taking medication.  *Id.*  She told Dr. Shanmugham that she was taking Dilantin, but was still having seizures.  *Id.*  Dr. Shanmugham noted that after reviewing Dr. Prichard's neuropsychological testing, Krahner's testing was consisted with close head injuries and that she "had deficits in executive functions."  R. 251.  Dr. Shanmugham's impression was that Krahner had a history of generalized tonic clonic convulsions, and recommended video EEG monitoring for possible surgical therapy and "help in managing her medications better."  *Id.*

Another state agency psychologist completed a Mental Residual Functional Capacity Assessment on June 25, 2001.  R. 252.  The psychologist opined that Krahner was "moderately

limited" in her abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods of time; to work in coordination with or proximity to others without being distracted by them; to be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. R. 252-53. The psychologist assessed an organic mental disorder as shown by Krahner's memory impairments and mood disturbances, and opined that an RFC assessment was necessary. R. 258. The psychologist further opined that Krahner had "mild" limitations carrying out her activities of daily living and maintaining social functioning, "moderate" limitation maintaining concentration, persistence, or pace, and one or two repeated episodes of decompensation. R. 267.

In September 2001, another state agency physician assessed Krahner's physical residual functional capacity. R. 151. The physician opined that Krahner had no exertional, postural, manipulative, visual, or communicative limitations. R. 152-55. The physician did, however, opine that Krahner had to avoid all exposure to hazards (including machinery and heights) "due to [her history] of seizures." R. 155. Krahner, otherwise, had no environmental limitations. *Id.* The physician noted that while Krahner related a history of seizures over the previous year, Krahner's file included no "third-party confirmation of witnessing generalized seizure dates, and no documentation . . . of a seizure disorder by EEG." R. 156.

Dr. Gregory P. Samano, II, D.O. treated Krahner, mainly for seizure disorder and myositis, from May 3, 2001 to November 26, 2001.[5] R. 287-98. Krahner saw Dr. Samano on July 25, 2001,

---

[5]The record also includes the office notes of an unnamed doctor who provided treatment from August 22, 2000 to April 16, 2001. R. 232-234, 240-247. The notes appear similar to Dr. Samano's notes, and are consistent with Dr. Samano's notes from May 3, 2001 to November 26, 200. *See* R. 287-89. The doctor's notes include diagnoses and treatment of seizure disorder (R. 232, 234, and 247), bronchitis (R. 246), migraine headaches (R. 243 and 244), myositis (R. 233, 234, 241, 243, and 244), anxiety (R. 243), and wheezing (R. 234 and 241).

and reported having a seizure three days prior.  R. 292.  The doctor's office notes state that Krahner

had a laceration on the bridge of her nose.  *Id.*  On September 7, 2001, Krahner saw Dr. Samano and

complained of neck pain.  R. 289.  She also reported having one recent seizure.  *Id.*

Dr. Samano's impression was myositis (inflammation of the muscles), spinal strain, injury to

the shoulder, and seizure disorder.  *Id.*  In a letter dated October 17, 2001 and addressed "To Whom

[I]t May Concern[,]" Dr. Samano stated that Krahner "has a long history of poorly controlled

seizures."  R. 288.  He further noted that Krahner's seizures caused numerous injuries, "including

muscle strains in her back and shoulder, a large number of contusions to her body and face, and a

fractured tibia."  *Id.*  The doctor also stated that Krahner's "seizure disorder is very significant and

continued neurological care is necessary to attempt to control her seizures."  *Id.*  On November 26,

2001, according to Dr. Samano's office notes, Krahner reported having a seizure and sustaining

injuries three days prior.  R. 287.  Dr. Samano observed an abrasion on Krahner's forehead and

swelling in her right foot  *Id.*

Krahner had a seizure on April 28, 2002 and went to the emergency room at Orlando Regional

Hospital. R. 303.  Krahner reported having a grand mal seizure that day followed by severe lower

abdominal pain.  *Id.*  Krahner told the doctor that she stopped taking Dilantin in December 2001 due

to pregnancy.  *Id.*  She was nineteen weeks pregnant at the time of the hospital visit.  *Id.*  The doctor's

final diagnoses was abdominal pain, probably muscle strain, threatened abortion, and seizure disorder.

R. 305.

Dr. Hal S. Pineless, D.O. treated Krahner from May 8, 2002 to November 1, 2002.  R. 323-

336.  On May 8, 2002, Dr. Hal S. Pineless saw Krahner for a neurology consultation regarding her

seizures.  R. 334-36.  Krahner related that she stopped taking Dilantin in late December 2001, and

discovered that she was pregnant in early January 2002. R. 334. Dr. Pineless noted that Krahner has

tried various anticonvulsant medications throughout her life, but many were discontinued "due to

ineffectiveness or side effects." *Id.* He noted, for instance, that phenobarbital caused Krahner to be

lethargic. R. 334-35. Krahner reported that her last generalized tonic-clonic seizure was ten days

prior to the visit but that prior to that seizure, she had no seizures for five months. R. 335. Dr.

Pineless' impression was partial complex seizures with secondary generalization, and he prescribed

Dilantin, which she had stopped using five months prior. R. 336.

Krahner saw Dr. Pineless again on June 12, 2002. R. 332-33. Krahner's Dilantin level was

low. R. 332. Dr. Pineless noted that Krahner "has been pretty good about taking her medication,

although her boyfriend admits sometimes she misses her evening dosage." *Id.* Dr. Pineless's

impression was partial complex seizures with secondary generalization induced by trauma. *Id.*

On July 31, 2002, Krahner visited Dr. Pineless, and reported that she was taking 500

milligrams of Dilantin per day  R. 330-31. Krahner complained of low back pain and having

headaches. R. 330. Dr. Pineless noted that his "impression is that the patient's partial complex

seizures with secondary generalization induced by trauma are responding nicely to Dilantin." *Id.* The

doctor further observed that her July 5, 2002 Dilantin level was normal. *Id.* He recommended

Tylenol for her headaches, and that she continue taking Dilantin. *Id.*

On August 26, 2002, Krahner returned to Dr. Pineless. R. 328-29. Krahner reported that her

pregnancy was going well, and that she had followed his instructions to increase her Dilantin dosage

to 300 milligrams per day. R. 328. In his notes, Dr. Pineless observed:

> It sounds like that was a good idea, because it sounds like she might have been having
> some breakthrough partial complex seizures or at least auras associated with seizures.
> She was having some visual hallucinations and what sounds like some deja vu

experiences.  This has improved since we increased the Dilantin . . . . My impression is that the patient's seizures are relatively well controlled with Dilantin.  Her seizures are partial complex seizures with secondary generalization.

*Id.*

October 3, 2002, Krahner saw Dr. Pineless, and reported delivering her baby without any problems.  R. 327.  Krahner also reported taking 500 milligrams of Dilantin per day, but noticed that she was having "a few auras" in the previous few days, so took 400 milligrams of Dilantin per day.  *Id.*  Dr. Pineless' impression was partial complex seizures with secondary generalization that were well-controlled with Dilantin.  *Id.*  He instructed Krahner to continue taking 500 milligrams of Dilantin per day.  *Id.*

On November 6, 2002, Krahner reported to Dr. Pineless that despite taking 500 milligrams of Dilantin per day, she continued to have "episodes where she has difficulty getting words out to express herself."  R. 326.  Krahner also reported having staring spells.  *Id.*  Dr. Pineless noted that Krahner was not having generalized seizures, "but it sounds like she is having partial complex seizures."  *Id.*  He also noted that her Dilantin level three weeks prior reflected that she was taking 500 milligrams of Dilantin per day.  *Id.*

Dr. Pineless' impression was partial complex seizures "that need to be better controlled."  *Id.*  He noted that increasing her dosage of Dilantin would "throw her into Dilantin toxicity," and recommended adding Keppra medication, another anticonvulsant medication, while reducing her dosage of Dilantin.  *Id.*  The same day, Krahner called Dr. Pineless to state that she read the brochure on Keppra and was concerned about taking it while breastfeeding.  R. 325.  Dr. Pineless suggested that she give up breastfeeding, and Krahner agreed.  *Id.*

-33-

Dr. Pineless saw Krahner on November 21, 2002.  R. 323.  She reported that she was lethargic on Keppra medication and had "some breakthrough partial complex seizures" but no generalized tonic clonic seizures.  *Id.*  Dr. Pineless noted that Krahner was lethargic in his office, and complained of being groggy and sleepy.  *Id.*  Dr. Pineless' impression was partial complex seizures with secondary generalization.  He also stated: "[w]e are having some difficulty with controlling her partial complex seizures, mainly because of her intolerance to numerous [anticonvulsants]."  R. 323.  As Krahner reported having the most success while taking Depakote, the doctor instructed her to lower her dosage of Dilantin in order to wean her off Dilantin to switch to Depakote.  R. 323-24.  Dr. Pineless suggested that if Depakote did not work, Krahner may have to consider treatment by undergoing surgical implant of a vagal nerve stimulator "since she has been refractory to so many medications, either due to ineffectiveness of the drug or side effects."  R. 324.

On November 25, 2002, Krahner testified at a hearing before the ALJ.  R. 349.  Krahner testified that the last record of her seizure was from April 2002 when she had a grand mal seizure and went to the emergency room.  R. 355.  Krahner stated that she had another grand mal seizure in May or late April 2002.  R. 355, 361-62.

Krahner described the nature and frequency of her seizures.  She testified that she has grand mal seizures which make her tired.  R. 360.  According to Krahner, after a grand mal seizure, it takes her two days to "get her energy back."  *Id.*  Krahner stated that as a result of the seizures, she has sustained injuries, including broken ankles and cuts on her head and face.  R. 362.  Krahner also stated that she has petite mal seizures almost every day, and grand mal seizures up to four times a month, but "sometimes I can skip a month, sometimes I can skip six months from having a grand mal seizure."  R. 361.  She also stated that she occasionally has grand mal seizures while sleeping.  *Id.*

-34-

Krahner testified that she takes medication for seizures, but that she has "breakthroughs of seizures through the medication." R. 362. Krahner further stated that none of her medications have been effective in controlling the seizures. R. 363.

Krahner also testified that she is able to stand for approximately ten to fifteen minutes, and that she generally sits down because she gets dizzy when standing. R. 364. Krahner stated that she can walk, bend from waist, and has no problems using her hands. *Id.* Also, she reported that she is able to lift fifteen to twenty pounds. R. 365 Krahner stated that she is able take care of her own personal hygiene, cook using the microwave or by making sandwiches, and do laundry slowly over the course of a week. *Id.*

As part of her applications for benefits and for reconsideration, Krahner submitted a Physical and/or mental Black Out Incident Diary covering from August 30, 2001 through May 16, 2002.[6] R. 77-88. In the diary, Krahner, her mother, and Richard F. Johnson describe Krahner's seizures and symptoms associated with her seizures, including jerks, staring spells. dizziness, loss of limb control, vision problems, and headaches. *Id.* Krahner details a number of body jerks and staring spells (as many as twelve per day) occurring seventeen days in September 2001 (R. 85-88) and twelve days with body jerks and staring spells in October 2001 (R. 82-84). In the diary, approximately five entries by Krahner and her witnesses note that she had seizures. R. 77,79, 80, 84, 87.

Krahner also submitted letters from acquaintances and former co-workers who state that they have witnessed Krahner's seizures and seizure-like symptoms. R. 89-101. One witness describes in

---

[6]One entry by Krahner's mother is dated "May 16" without stating the year. R. 79. The previous entry is dated March 6, 2002. R. 77.

detail Krahner's seizure on July 22, 2001.  R. 89-90.  Other witnesses state that they have seen her

have one to several seizures.  R. 91-101.

**B.      THE ANALYSIS**

On January 30, 2003, the ALJ issued a decision that Krahner was not disabled and not entitled

to benefits.  R. 27.  Following a review of the medical and other record evidence, the ALJ found that

Krahner could not perform her past relevant work as a bartender, a waitress, and a pharmacy

technician.  R. 19, 26, Finding 8.  The ALJ found that Krahner nevertheless retained the residual

functional capacity ["RFC"] to perform a significant range of the physical exertional requirements of

light work, subject to certain limitations.  R. 26, Findings 7, 12.  After hearing testimony from the VE,

the ALJ, applying the Medical-Vocational Guidelines, concluded that Krahner was not disabled.  R.

26, Findings 13, 14.

Krahner assigns five errors to the Commissioner.[7]  Krahner contends that the Commissioner

erred: 1.) by failing to consider and make the additional records she submitted to the Appeals Council

after the ALJ's decision part of the record; 2.) by failing to meet her burden of proof to  show that

other work exists in the national economy that Krahner can perform because the ALJ did not include

the impairment of seizures in her hypothetical question to the VE; 3.) by incorrectly finding that

Krahner's testimony is not consistent with the medical evidence;  4.) by failing to consider all of the

relevant evidence on Krahner's epilepsy as required by the Code of Federal Regulations; and 5.) by

failing to articulate specific and adequate reasons for discrediting Krahner's testimony.

---

[7]As three of the five issues Krahner raised do not require remand, the undersigned addresses the two issues
requiring remand first (and in reverse from the order Krahner argues the issues in her memorandum).

*1.    New Evidence Submitted to the Appeals Council*

After the ALJ issued her decision and before the Appeals Council denied review on April 15, 2005, Krahner submitted additional medical records and evidence which were *not* considered by the Appeals Council and *not* made part of the record.  Docket No. 13-1 at 14; *see also*  Docket No. 13-2 at 2 (certified mail return receipt dated August 9, 2004).  Krahner contends that the Appeals Council erred by failing to consider this new evidence and make it part of the record.  Docket No. 13-1 at 14.  The Commissioner never disputes that Krahner timely submitted new evidence to the Appeals Council.  *Id.* at 16-17.  Instead, the Commissioner argues that "whether the evidence was submitted to the [Appeals Council] or not is irrelevant, as the Court uses the same standard in reviewing the evidence." *Id.*  The Commissioner is incorrect.

The Appeals Council's denial of review is a final decision of the Commissioner that is subject to review under section 405(g).  *Williams*, 407 F. Supp. 2d at 1302-03.  Further, when evidence is submitted *only* to the Appeals Council, the case may be remanded under sentence four, and need not be evaluated under the three-prong standard for remand under sentence six  *Id.* at 1303.  According to Code of Federal Regulations, the Appeals Council *shall* evaluate the entire record, including the new and material evidence submitted if it relates to the period on or before the date of the ALJ's action.  20 C.F.R. § 404.970 (b).

Krahner timely submitted to the Appeals Council new medical records covering the period from November 23, 2001 to April 4, 2004.  In this case, the Appeals Council does not state whether it considered or rejected the new evidence, and in fact never mention the new evidence.  R. 4.  Without knowing what the Appeals Council did with the evidence (or whether they even saw the

evidence), it is impossible for this Court to determine whether the Appeals Council erred in denying review of Krahner's evidence.

The Commissioner argues that the additional evidence is not material in that it could not reasonable have been expected to change the administrative decision.  *Id.* at 15.  More specifically, the Commissioner contends that, with the exception of a report from Krahner's chiropractor, all of the medical records date after January 30, 2003, the date of the ALJ's decision.  Krahner claims that the new evidence provides further support that Krahner suffers from primary generalized epilepsy. Docket No. 13-1 at 15.  The new evidence includes, *inter alia*: 1.) an April 22, 2003 neurologic evaluation in which Dr. William Tatum opines that Krahner has "Intractable Epilepsy"(Docket No. 13-3 at 10); 2.) a daily log completed by Krahner for Dr. Tatum for the months of July and August 2003 chronicling the frequency of her seizures, jerks, and other symptoms (Docket No. 13-3 at 2); and 3.) a letter from Dr. Robert Bonwetsch dated January 15, 2004 stating that Krahner was evaluated (by performing long-term video EEG monitoring at the National Institute of Health in the Clinical Epilepsy Section in Bethesda, Maryland), that Krahner suffers from primary generalized epilepsy, and that Krahner will have to be treated with anti-seizure medication for the rest of her life, as she is not a candidate for epilepsy surgery (*Id.* at 8).  The new evidence, most of which is dated within a year after the ALJ's decision, has bearing on Krahner's condition during the relevant period of time. Remand is required for consideration of the additional evidence.

### 2. *The ALJ's Hypothetical Question to the VE*

Krahner also argues that the ALJ erred by failing to include seizures in posing hypothetical questions to the VE.  Docket No. 13-1 at 13.  Krahner concludes that the Commissioner failed to meet her burden of proving the existence of other jobs in the national economy that Krahner can perform.

*Id.*   The Commissioner argues that the ALJ's hypothetical accurately captured all of Krahner's reasonable limitations, and that the VE's testimony provides substantial evidence to support the ALJ's conclusion that Krahner could perform other work.   Docket No. 14-1 at 14.   Krahner is correct.

In this case, the ALJ correctly recognized that Krahner's non-exertional impairments precluded exclude the use of the grids to establish that Krahner could perform other work that exists in the national economy.   *See* R. 25.   The ALJ thus relied on VE testimony.   Reliance on VE testimony is proper where the hypothetical questions posed by the ALJ accurately depict a claimant's impairments.

During Krahner's hearing, the ALJ asked the VE a series of hypothetical questions in an effort to recite work restrictions similar to Krahner's. The ALJ stated to the VE:

> I'm first going to assume that I have a client who is 31-years of age who has a GED and has the past work experience as described for the claimant.  I'm going to assume that this individual could lift 50 pounds occasionally, 25 pounds frequently, could sit for six hours in an eight-hour day, could stand and walk for six hours out of an eight-hour day.  And is to never climb ladders, ropes or scaffolds and could frequently climb ramps and stairs, stoop, kneel, crouch or crawl.  And is to avoid even moderate exposure to hazards such as machinery in Exhibit 9F.  And that she has mild limitations of activities of daily living and mild difficulties maintaining social functioning, but moderate difficulty or limitations, in concentration, persistence or pace.  And has had one to two repeated episodes of decompensation each for an extended duration.  And she is moderately limited in the ability to understand, remember and carry out detailed instructions and the ability to maintain attention and concentration over extended periods, as well as an inability to work in coordination with, or proximity to others, without being distracted by them.  And in the ability to be aware of normal hazards and take appropriate precautions and the ability to travel in unfamiliar places or use public transportation . . . . Would such an individual be able to perform any of the past relevant work performed in the past, either as it's actually performed or as this occupation is customarily in the national economy?  If not, are there other occupations such an individual could perform?

R. 370-71.  The VE stated that the individual would be able to perform the duties of a pharmacy technician, but not a bartender, waitress, or milling machine operator because those jobs required exposure to machinery.  R. 371.

Next, the ALJ asked the VE to assume an individual with the same limitations already stated, except that this individual could only lift twenty pounds occasionally and could stand for two hours and sit for eight hours during an eight-hour day, and asked the VE whether this individual would be able to perform any of Krahner's past relevant work.  R. 371-72.  The VE stated that the individual would not be able to perform her past relevant work, but was capable of performing other work in the national economy.  R. 372-73.  The VE identified positions involving sedentary work activity, including appointment clerk, information clerk, and a credit card clerk (who would answer telephones and attend to inquiries).  *Id.*

During the hearing, Krahner's attorney noted that the ALJ's hypothetical did not include the impairment of seizures, and stated that Krahner testified to having seizures almost every day.  R. 373.  The ALJ responded that "[t]he seizures were in the hypothetical I gave . . . with the fact that she would never climb ladders, ropes or scaffolds . . . that she was to avoid moderate exposure to hazards such as machinery, [and] . . . with the mental limitations I gave also."  *Id.*  Krahner responded that during her work as a receptionist, she had a seizure and fell forward onto her computer.  R. 374.  She also stated that if she does not sleep nine hours at night, she has to lay down for approximately three to four hours in the afternoon.  *Id.*  The VE testified that these additional limitations "would preclude all of the positions that were offered."  R. 375.

Krahner testified to having approximately four grand mal seizures per month (but sometimes fewer) and petit mal seizures almost every day.  R. 361.  The ALJ found that Krahner's testimony was

-40-

"somewhat exaggerated and not consistent with the medical evidence as a whole" because, *inter alia*: 1.) Krahner had a history of non-compliance with her medication; 2.) Krahner's EEGs and MRI were normal; 3.) Krahner stopped taking medication while pregnant and only experienced a few auras; and 4.) the neurological testing by Dr. Prichard showed only some mild deficits and placed her within the average range of intellectual functioning.  R. 22-23.  The ALJ attempted to account for Krahner's seizures by including some impairments, such as inability to climb ladders, inability to work with hazards, and certain mental limitations.  These impairments, however, are not enough.  The ALJ should have reported seizures to the VE, including the rate and severity of seizures and any adverse side effects caused by seizure medication.

While the ALJ found that Krahner's testimony was "somewhat exaggerated," the evidence does not show (and the ALJ does not find) that Krahner *never* had seizures, or that the medications' side effects did not affect Krahner's ability to work.  In fact, throughout the record, a number of doctors stated that Krahner has "breakthrough seizures" or that her medications are not effective, without finding that Krahner was non-compliant.  In February 1998, when Krahner went to the emergency room, the doctor diagnosed "breakthrough seizures."  R. 280-81.  In 2000, Dr. Al-Banna noted that Krahner's seizure medication was not effective, and that Krahner experienced adverse side effects from her seizure medication.  R. 183.  Dr. Nieves-Quinones noted that Krahner had signs of toxicity from seizure medication.  R. 203.  In 2001, Dr. Durham and Dr. Samano saw physical injuries after Krahner reported having seizures.  R. 248 (twisted ankle), 292 (laceration on nose).  In 2002, Dr. Pineless noted that phenobarbital caused Krahner to be lethargic (R. 334-35), and that Krahner may be having partial complex seizures while her Dilantin level showed that she was taking her prescribed dosage of seizure medication.  R. 326.  In short, many if not all of the seizures that Krahner reported

-41-

to her doctors are corroborated by others, by related injuries, and by medication adjustments and limitations (driving) imposed by treating doctors.

Substantial evidence shows that Krahner had seizures and significant problems associated with seizure medication.  Even if occurring less frequently than Krahner herself described, the ALJ's hypothetical to the VE did not fully describe the limitations.  The VE never considered a person with all of Krahner's impairments, and in fact, when confronted with a different hypothetical including seizures, answered that those impairments would preclude all of the jobs mentioned.  The Commissioner failed to meet her burden, and remand is necessary on this issue.

       3.     *The ALJ's Finding that Krahner's Testimony is Not Consistent with the Evidence as a Whole*

As stated earlier, Krahner testified that she sometimes has as many as four grand mal seizures per month and petit mal seizures almost every day, but she also testified that she could go six months without a seizure.  R. 361.  The ALJ found that Krahner's testimony was "somewhat exaggerated and not consistent with the medical evidence as a whole."  R. 23.  Krahner claims that the ALJ erred by finding that Krahner's testimony about the frequency of her seizures is inconsistent with the evidence as a whole.  Docket No. 13-1 at 11.  The Commissioner responds that substantial evidence supports the ALJ's credibility finding.  Docket No. 14-1 at 12.

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Krahner only objects to the ALJ's credibility finding as to whether Krahner has seizures and the frequency of seizures.  *See* Docket No. 13-1 at 11-12.  As stated earlier, the ALJ did not find that Krahner never has seizures.  In fact, as discussed earlier, the ALJ attempted to account for Krahner's

seizures by adjusting the conditions under which Krahner can work.  The ALJ merely found that Krahner's testimony as to the frequency of her seizures was not credible.  Although the Court sees no obvious inaccuracy in Krahner's reports on frequency, the Court will not disturb the ALJ's articulated credibility finding.

### 4.     *The Listings*

Krahner also claims that the ALJ failed to consider all of the evidence that she presented, specifically letters from witnesses to her seizures, and her Physical and/or Mental Black Out Incident Diary, as required by the Code of Federal Regulations.  Docket No. 13-1 at 8.  According to Krahner, the ALJ erred because the letters and diary support a determination that she is disabled under Listings 11.02 and 11.03.  *Id.* at 9.  The Commissioner counters that the ALJ was not required to discuss every record submitted, and that Krahner has failed to meet the strict standards for presumptive disability under the Listings.  Docket No. 14-1 at 9.  The Commissioner is correct on both issues.

First, the ALJ is not required to refer to every piece of evidence in the record.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).  Surely the ALJ considered such critical pieces of evidence.  Second, the claimant has the burden of establishing the existence of an impairment or combination of impairments that meet or equal the criteria in the Listings.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  The claimant must meet or equal all the requirements of a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990).  Mere diagnosis of a listed impairment is by itself not sufficient; the record must contain corroborative medical evidence supported by clinical and laboratory findings.  *Carnes*, 936 F.2d at 1218.  If a claimant contends that an impairment equals a listed impairment, the claimant must present evidence that describes how the impairment has such an equivalency.  *Wilkinson on Behalf of Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987).

Here, the ALJ found that Krahner had three specific medical impairments: seizure disorder, cervical myositis, and an organic mental disorder.  R. 22.  The ALJ found that these impairments were "severe," but "not severe enough to meet or equal one of the impairments listed in Appendix 1, Subpart P, and Regulations No. 4."  R. 22.  As support, the ALJ stated that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show limitations or medical signs or findings that are the same or equivalent to those of any listed impairment."  R. 22; *see also* 26, Finding 4.  Considering the record as a whole, including the letters and diary, the ALJ did not err by concluding that Plaintiff did not meet the requirements of listings 11.02 and 11.03.[8]  *See Carnes*, 936 F.2d at 1218; *Sullivan*, 493 U.S. at 530-31.  Likewise, Krahner fails to prove that a finding of disability is mandated because the combined effect of her impairments establish a listing equivalence.  Remand is unnecessary on this issue.

---

[8]Two listings relate to seizures.  Listing 11.02 provides:

11.02 Epilepsy--convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.
    A. Daytime episodes (loss of consciousness and convulsive seizures) or
    B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1.  Listing 11.03 states:

11.03 Epilepsy--nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

5.      *The ALJ's Reasons for Discrediting Krahner's Testimony*

Krahner argues that the ALJ did not articulate adequate reasons for rejecting Krahner's testimony.   More specifically, Krahner claims that the ALJ rejected Krahner's testimony on the ground that the record contained no evidence of Krahner's April 2002 emergency room visit.  Docket No. 13-1 at 7.  Krahner notes that the record contains evidence of this visit, and that this error requires reversal.

Krahner's argument is without merit.  As discussed earlier, the ALJ articulated a number of reasons (including objective medical tests, Krahner's overall infrequency of seizures, and Krahner's non-compliance) for finding Krahner's testimony "somewhat exaggerated and not consistent with the medical evidence as a whole."  R. 22-23.  Remand on this issue is not necessary.  Of course, the Commissioner is free to re-evaluate credibility issues on remand if she so desires.

## VI.     <u>CONCLUSION</u>

For the reasons stated above, the decision of the Commissioner should be **REMANDED** under Sentence Four.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within eleven days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED** this 30th day of June, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

The Honorable Gregory A. Presnell
United States District Judge

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

The Honorable Philemina McNeil Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817

-46-